**CLARK REGIONAL MEDICAL CENTER, et al., Plaintiffs,**

v.

**Donna E. SHALALA, Secretary, United States Department of Health and Human Services, Defendant.**

No. Civ.A. 99–465.

United States District Court, E.D. Kentucky.

March 30, 2001.

Sharon K. Hager, A. Courtney Guild, Jr., (See above), for Pattie A. Clay Hospital, plaintiff.

Frances Catron, U.S. Attorney's Office, EDKY, Lexington, KY, Bruce R. Granger, Chief Counsel, Howard H. Lewis, United States Department of Health & Human Services, Atlanta, GA, for Donna E. Shalala, Secretary of the United States Department of Health and Human Services, defendant.

## OPINION AND ORDER

FORESTER, Chief Judge.

This matter is before the Court on the plaintiffs' motion for judgment [DE# 11] and the plaintiffs' motion for leave to file a supplemental brief [DE# 19].

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves the defendant's interpretation and application of the complex Medicare payment system to the plaintiff hospitals, and specifically the defendant's determination of the plaintiffs' eligibility for an adjustment for "disproportionate share hospitals" or "DSH" under 42 U.S.C. § 1395ww(d)(5)(F)(v).

The plaintiffs are licensed by the Commonwealth of Kentucky for 100 and 105 acute care beds and both operate and staff their facilities for all of these licensed beds. Both facilities are also certified by the defendant as "swing-bed" facilities, which means that they may, as necessary, use a designated number of their acute care beds to provide post-hospital skilled nursing care on a temporary basis.[1] Both facilities also occasionally use their beds for patient observation to determine whether a particular patient should be admitted—some patients are ultimately admitted, while others are not.

Medicare uses different payment methods for different services. Inpatient hospital services are reimbursed under Part A on a "Prospective Payment System" ("PPS"). In general, under this method a hospital is paid a predetermined rate based upon the patient's diagnosis, regard-

less of the hospital's actual costs. Observation beds, on the other hand, are paid under Part B on a "reasonable cost" basis because observation is considered an outpatient service. Likewise, SNF beds are not paid under the PPS, but on a separate basis. In determining its "reasonable costs," a hospital must apportion costs between Medicare and non-Medicare patients in the cost reports that it submits to the defendant. According to the defendant, this requires hospitals to make a calculation of "total inpatient routine service costs," which excludes observation days and SNF days in swing-bed hospitals. In other words, observation and SNF days are carved out of the "reasonable cost" calculation.

When Congress established PPS, it recognized that hospitals that serve a significantly disproportionate number of low-income patients incur additional costs that may not be fully compensated by the PPS. Therefore, it established an adjustment for these disproportionate share hospitals, commonly referred to as the "DSH adjustment." 42 U.S.C. § 1395ww(d)(5)(F)(v). Under the statute, a hospital that is located in an urban area[2] and has "100 or more beds" qualifies for the DSH adjustment if 15% of its patients are low-income patients. However, if the hospital has less than 100 beds, the low-income patient threshold is a substantially higher 40%. *Id.*

For the years at issue here, 1992–1996, both of the plaintiffs qualified for and received the DSH adjustment. However, according to the plaintiffs, in June of 1997 the defendant changed the method it used

---

1. A "skilled nursing facility" ("SNF") is commonly known as a nursing home. In a qualifying swing-bed hospital, the hospital may permit their standard beds, typically used for acute care patients, to "swing" temporarily to SNF care use and then "swing back" to acute care when the SNF care is complete. This permits hospitals that, due to geographic or

other limitations, might be unable to find space in an area nursing home. These swing-bed facilities may provide this care for a limited amount of time, no more than five (5) days. *See generally* 42 U.S.C. § 1395tt.

2. The parties do not dispute that the plaintiffs are classified as being in an "urban" area.

to count beds in determining eligibility for the DSH adjustment and then retroactively applied this new counting method to previous years. As a result, the plaintiffs were no longer eligible for the adjustment and were required to return approximately $5,092,243 in adjustments previously paid, but for which the plaintiff hospitals were retroactively determined to have been ineligible.

The plaintiffs appealed this decision to the Provider Reimbursement Review Board ("PRRB"), which found in favor of the hospitals. The defendant[3] then appealed this decision to the Health Care Financing Administration ("HCFA"), which reversed the PRRB's ruling and reinstated the earlier finding that the plaintiffs were ineligible for the DSH adjustment for the years at issue. This suit followed.

## II. THE REGULATIONS AND ADMINISTRATIVE RULINGS

### A. *Applicable Regulations and Guideline*

Pursuant to regulations promulgated by the defendant, the number of beds in a hospital for purposes of determining DSH adjustment eligibility "is determined in accordance with § 412.105(b)." 42 C.F.R. § 412.106(a)(1)(I). Section 412.105(b) is used to determine a hospital's eligibility for a separate PPS adjustment for indirect costs associated with graduate medical education programs, referred to as the "IME" adjustment. Thus, the defendant determined that in counting beds for either adjustment, the same method would apply.[4] The applicable regulation states as follows:

Determination of number of beds. For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period, not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

*Id.* § 412.105(b). The defendant also provided further guidance on the methodology of counting beds under 42 C.F.R. § 412.105 in its "Provider Reimbursement Manual" ("PRM") as follows:

G. Bed Size.—A bed is defined for this purpose as an adult or pediatric bed (exclusive of beds assigned to newborns which are not in intensive care areas, custodial beds, and beds in excluded units) maintained for lodging inpatients, including beds in intensive care units, coronary care units, neonatal intensive care units, and other special care inpatient hospital units. Beds in the following locations are excluded from the definition: hospital-based skilled nursing facilities or in any inpatient area(s) of the facility not certified as an acute care hospital, labor rooms, PPS excluded units such as psychiatric or rehabilitation units, postanesthesia or postoperative recovery rooms, outpatient areas, emergency rooms, ancillary departments, nurses' and other staff residences, and other such areas as are regularly maintained and utilized for only a portion of the stay of patients or for purposes other than inpatient lodging.

---

3. Technically, it was a fiscal intermediary, an agent of the defendant, involved in the proceedings below. However, for ease of reference, the Court will refer to these parties interchangeably as "defendant."

4. Interestingly, a lower bed count under the IME adjustment benefits hospitals, while a higher bed count under the DSH adjustment inures to the benefit of hospitals.

To be considered an available bed, a bed must be permanently maintained for lodging inpatients. It must be available for use and housed in patient rooms or wards (i.e., not in corridors or temporary beds). Thus, beds in a completely or partially closed wing of the facility are considered available only if the hospital put the beds into use when they are needed. The term "available beds" as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service.

In the absence of evidence to the contrary, beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting period. The hospital bears the burden of proof to exclude beds from the count.

PRM § 2405.3.G. The PRM guideline also provided a specific example in which a hospital has 185 acute care beds, including 35 beds that were used to provide long-term care. The PRM example stated that all 185 beds should be included in the count since the beds were certified for acute care, noting that "although 35 beds are used for long-term care, they are considered to be acute care beds unless otherwise certified." PRM § 2405.3.G.2.

In determining eligibility for the DSH adjustment prior to the fiscal years in question, the defendant counted observation and swing bed days as part of the total bed count. Under this method, there was no issue regarding the plaintiffs' eligibility as a DSH. In June of 1997, however, the defendant determined that it had not been using the correct counting method and that it was appropriate to exclude days that the plaintiffs used their hospital beds for observation or SNF services.

This rendered the plaintiffs ineligible for the DSH adjustment.

The defendant's primary justification for this position was that the DSH adjustment applies only to PPS payment amounts, so only beds reimbursed under the PPS should be included. Because observation and swing beds are excluded from the PPS, those bed days should also be excluded from determining eligibility for the DSH adjustment to the PPS payment amount. More specifically, the defendant asserted that these beds were not "permanently" maintained and available for lodging inpatients, so they should never have been counted under the defendant's applicable regulations. The plaintiffs argued that Congress never intended the complicated bed counting method promulgated by the defendant and, even if it were permissible, that they met the criteria in the regulations.

## B. *Decision of the Provider Reimbursement Review Board*

As noted above, the PRRB ruled in favor of the hospitals. It found that the observation bed days and swing-bed days met all of the program's requirements to be included in the bed size calculation used to determine DSH eligibility. Specifically, all of the beds were licensed acute care beds located in the acute care areas of the hospitals. They were permanently maintained and available for lodging inpatients. The fact that the beds were sometimes occupied by observation patient or SNF patients did not affect their availability. The PRRB also relied on the fact that neither the regulations nor the PRM guideline expressly excluded these specific beds from the bed count, while specifically excluding others. Therefore, the list of exclusions was all-inclusive.

The PRRB also found that the example provided by the defendant in the PRM

guideline was directly on point, in that it stated that acute care beds that are temporarily or occasionally used for another type of patient care, but not certified as such, are included in the count. It also found that the temporary use of acute care beds for observation or SNF care did not change the size of the facility, as discussed in PRM § 2405.3.G.

### C. Decision of the HCFA Administrator

The defendant appealed to the HCFA Administrator which reversed the PRRB's ruling and upheld the defendant's exclusion of observation and swing beds from the bed count calculation. The HCFA Administrator first noted that the defendant had a longstanding policy of only considering bed days in the bed count if the costs of such days were allowable in the determination of Medicare inpatient costs. It then concluded that because of this longstanding policy, it was proper for the defendant to determine the plaintiffs' DSH eligibility based only on beds which were recognized as part of the PPS hospitals' inpatient operating costs, which would exclude observation and SNF beds because they are reimbursed on a "reasonable cost" basis. The HCFA Administrator also disagreed that the PRM guideline listing constituted an all-inclusive list of exclusions and that excluding observation and swing bed days from the calculation was not inconsistent with Congress' intent that the DSH adjustment be an additional payment for PPS hospitals.

The HCFA Administrator also disagreed that the example in the PRM supported the hospitals because in the example, certification determines the payment and the payment indicates whether the bed was used for inpatient services (and, thus, recognized under PPS) on a particular day. In contrast, with observation and swing beds, the method of payment indicates whether the bed was used for inpa-

tient hospital services for the day. The HCFA Administrator also found that a bed occupied by an observation or swing bed patient was not available for inpatient lodging on the day it was otherwise occupied and, therefore, that day should not count. Finally, regarding the burden of proof, the HCFA Administrator found that it was not improper to place the burden on the hospital to prove by a preponderance of the evidence that beds at issue were properly included in the count.

### III. PLAINTIFF'S MOTION FOR JUDGMENT

#### A. Plaintiffs' Arguments

The plaintiffs raise essentially the same arguments in this Court that they raised below. First, they argue that neither the regulation nor the PRM guideline specifically exclude the beds at issue and, therefore, under the principle of *ejusdem generis*, the beds at issue must be included. There is nothing in the legislative history of the statute, the regulations, or the PRM guidelines articulating a policy that bed counting follows the Medicare payment source and the heart of the DSH percentage involves counting patients who are not entitled to Part A benefits at all. They also argue that, per the PRM guideline, the hospital bears the burden of excluding beds and the defendant was arbitrary and capricious in holding that this rule is enforced only when it is to the provider's detriment, but may be disregarded when it benefits the provider.

The plaintiffs also argue that because the defendant decided to count beds for DSH eligibility the same way it counts beds for the IME adjustment, then the guidelines and case law applicable to the IME adjustment are equally applicable in this situation. The defendant cannot ignore the PRM guideline, which is mandatory and direct and clearly requires inclu-

sion of the beds at issue here. It also cannot escape its prior position in cases regarding the IME adjustment that the PRM guideline incorporated its existing policy setting forth the method for counting beds. The plaintiffs also argue that the court should reject the defendant's interpretation of the regulations and PRM guideline because of its history of hostility toward DSH payments.

The plaintiffs further contend that the defendant's reliance on an administrative bulletin issued by a fiscal intermediary in 1988 and an identical letter subsequently issued by a HCFA regional office to certain fiscal intermediaries constitutes impermissible rulemaking because it was done without notice and comment as required by the Administrative Procedure Act.

### B. *Defendant's Arguments*

The defendant argues that the regulations and its comments during rulemaking support the HCFA Administrator's decision. The DSH adjustment only applies to PPS payments and is within the section titled "PPS for Inpatient Hospital Services," so it makes sense to exclude the beds for the days when they are used for something other than inpatient services. Also, the principle of *ejusdem generis* supports this reading of the regulation, as observation and swing beds are in the same category—the category of non-PPS beds—excluded.

The defendant also argues that the PRM guideline provides additional support. The plaintiffs' beds are not *permanently* maintained for lodging inpatients because they are used for other purposes. The defendant also argues that part of the guideline relates only to temporary beds, empty beds, and beds in partially closed wings, not beds that are used for other purposes. The example indicates that PPS beds are included in the count, but PPS-excluded beds are not included in the count, and the reference to "35 beds used for long-term care" is not a reference to swing-bed hospitals, but a reference to "long-term care hospitals." Finally, the defendant argues that the PRM is not binding authority, but is simply an interpretive rule to be given "great weight."

Regarding the burden of proof, the defendant argues that a provider must prove that it is entitled to a reimbursement. Therefore, if a provider wants to qualify for a DSH adjustment, it bears the burden of proving the beds should be included. Further, the PRM guideline was written for the IME adjustment and not explicitly adopted for the DSH adjustment. It does not interpret § 412.105(b), which says nothing about the burden of proof.

Regarding the IME cases cited by the plaintiffs, these address a different issue than the one before the Court and support the defendant's interpretation that the determining factor is whether the bed is included in the hospital's cost report for the purpose of determining the size of the inpatient hospital. Therefore, they do not apply.

The defendant also argues that the number of beds is not determined by whether they are licensed. Just because the plaintiffs have 100 beds licensed by the Commonwealth of Kentucky does not mean all are included in the count. The defendant further argues that the letters it relies on are consistent with the regulations and the PRM guideline and show that its policy has not changed since 1988. There was no change in interpretation here, just a mistake by the fiscal intermediary that was corrected. There was also no "rulemaking" involved—even if the defendant's position was considered a change in interpretation, notice and comment were not required because the letters would be considered an interpretive rule,

not a "legislative" or "substantive" rule. Finally, the defendant's alleged "hostility" toward DSH does not require the Court to withhold deference to the agency interpretation of its own regulations.

## IV. STANDARD AND SCOPE OF REVIEW

The standard of review of an agency's interpretation of a statute is clearly set forth by the Sixth Circuit in *Jewish Hosp., Inc. v. Secretary of Health and Human Services,* 19 F.3d 270 (6th Cir.1994):

> This Court's review of this case is circumscribed by the Supreme Courts [sic] decision of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *CenTra, Inc. v. United States,* 953 F.2d 1051 (6th Cir. 1992), we reaffirmed that *Chevron* was the applicable standard when reviewing an agency's interpretation of a statute it was charged to administer, stating:
>
> > In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court explained how a court should treat an agency interpretation of statutes within the agency's ambit.
> >
> > > When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the *precise question at issue.* If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the *precise question at issue,* the court does not simply impose its own construction on the statute, as would be

necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the *specific issue,* the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842–43, 104 S.Ct. at 2781–82 (emphasis added). The Court went on to state that in determining whether an agency's answer is based on a permissible construction of a statute, a reviewing "court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11.

> *CenTra, Inc.,* 953 F.2d at 1055–56. The *Chevron* Court further stated, however, that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9.

*Id.* at 273–74. The Court may reverse an agency's interpretation of an ambiguous or silent statute only if it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. Even where, as here, a plaintiff alleges that the agency has inconsistently interpreted its own regulations or "changed" its interpretation over time, the Court must keep in mind that

> [a]dministrative agencies are not bound by their own prior construction of a statute. They are free to reject prior constructions which have not been endorsed by the courts. *See NLRB v. Local Union No. 103, International Association of Bridge, Structural & Orna-*

*mental Iron Workers,* 434 U.S. 335, 351, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978) ("An administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statutes."). We therefore review the Commission's construction of the statute without regard to the shift it represents from [a prior construction].

*Crounse Corp. v. I.C.C.,* 781 F.2d 1176, 1186 (6th Cir.1986) (cited in *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 947 n. 11 (6th Cir.2000)).

■ Once the Court determines that the agency's interpretation satisfies the *Chevron* analysis, it must then decide whether the agency's ruling is in accord with the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA").[5] 42 U.S.C. § 1395*oo*(f)(1) (stating that appeals are subject to the applicable provisions of the APA). Under the APA, the Court must set aside an agency action, findings, or conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). Regarding evidentiary determinations, they must be upheld if they are supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garcia v. Secretary of Health and Human Services,* 46 F.3d 552, 555 (6th Cir.1995) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

## V. ANALYSIS

In this case, Congress has not directly addressed the precise issue of whether observation or swing beds should be included in the bed count calculation in determining a hospital's eligibility for the DSH adjustment. Further, there is really no dispute in this case as to whether the defendant's regulations are a permissible construction of the statute at issue, 42 U.S.C. § 1395ww(d)(5)(F)(v). Therefore, the Court will assume for purposes of this analysis that the regulations at issue, 42 C.F.R. §§ 412.105–.106, pass *Chevron* muster.

■ The real question in this case is the defendant's implementation or application of these regulations to the plaintiff hospitals. Under the narrow "arbitrary and capricious" standard of the APA, the Court must determine whether the defendant's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment[.]" *Kentucky Heartwood, Inc. v.. Worthington,* 20 F.Supp.2d 1076, 1094 (E.D.Ky.1998).

■ The enabling statute at issue states that the DSH adjustment applies to hospitals of "100 or more beds" with a 15% low-income patient rate. 42 U.S.C. § 1395ww(d)(5)(F)(v). The defendant subsequently promulgated regulations setting forth the factors it would use to determine a hospital's eligibility for the DSH adjustment, which factors include the number of beds. 42 C.F.R. § 412.106(a)(1). The defendant then decided, without qualification, that it would use the same method of counting beds as it used in relation to the IME adjustment. *Id.* § 412.106(a)(1)(I). Therefore, it is proper to turn to any PRM

---

5. While there is some confusion in the case law applying one or the other of these tests, the Court finds that they should be considered separately. The *Chevron* analysis looks to an agency's interpretation of a statute, while the APA analysis looks to an agency's application of that interpretation in a particular case.

guidelines interpreting the IME bed-counting regulation for guidance on bed counting for purposes of the DSH adjustment. As noted by the United States Supreme Court, a PRM guideline is the "prototypical example of an interpretive rule" that is issued by an agency to advise the public as to how the agency will interpret the statutes it administers and its own regulations. *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)).[6]

The IME regulation at 42 C.F.R. § 412.105(b) states that "the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period, ***not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units,*** and dividing that number by the number of days in the cost reporting period." *Id.* (emphasis supplied). Under the plain meaning of this regulation, written by the defendant, the observation and swing bed days at issue here should not have been excluded from the count, as these beds are not "beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units."

The defendant's proposed construction tortures the plain language of the regulation. The regulation does not say "not including non-PPS beds" or "not including bed days that are not allowable in the determination of Medicare inpatient costs." It also does not say "not including beds *such as*" the beds listed. Rather, a plain and common sense reading of the regulation requires that all beds and all bed days be included in the calculation unless they are in one of the specifically enumerated categories of excluded beds.

The Court also disagrees that the beds at issue in this case are in the same category of beds listed in the regulation. The defendant argues that "beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units" simply defines a category of PPS-excluded beds. However, if the defendant meant specifically to exclude beds that are not included in the inpatient care cost calculation, it could have easily and directly done so in the regulation, but it did not.

The defendant's own PRM guideline also supports the inclusion of these bed days in the DSH eligibility count. The beds at issue are all located in acute care areas. At all times, they are maintained by the hospitals for lodging inpatients in terms of both location and staffing. They are not located in

> hospital-based skilled nursing facilities or in any inpatient area(s) of the facility not certified as an acute care hospital, labor rooms, PPS excluded units such as psychiatric or rehabilitation units, postanesthesia or postoperative recovery rooms, outpatient areas, emergency rooms, ancillary departments, nurses' and other staff residences, and other such areas as are regularly maintained and utilized for only a portion of the stay of patients or for purposes other than inpatient lodging.

PRM § 2405.4.G. The defendant argues that the beds at issue are very similar to beds in a "hospital-based skilled nursing facility" or in "outpatient areas" of the hospital. However, the PRM specifically states that only beds "located" in such areas should be excluded. None of the

---

6. The defendant's regulations also point out that in reviewing cases, the PRRB is bound by statutes, regulations, and HCFA rulings, and should give "great weight to interpretive rules" issued by the defendant. 42 C.F.R. § 405.1867.

beds at issue are located in a hospital-based SNF or in outpatient areas of the hospitals. Therefore, the fact that they temporarily may perform similar functions is irrelevant.

The PRM guideline states that to be considered "available," the beds must be *"permanently* maintained for lodging inpatients." The defendant reads this to say *"exclusively* maintained for lodging inpatients." There is no question that these beds are permanently maintained and staffed for acute care inpatient lodging. The fact that they are temporarily used for other purposes does not change this. Most importantly, the PRM guideline specifically states that the term " 'available beds' . . . is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service." The defendant argues that this simply means that a bed does not have to be empty to be "available." However, read together, these sentences mean what they say—that the number of "available beds" does not change based on a day-to-day fluctuation in patient rooms being used and only changes as beds are added to or taken out of service. It also reiterates the guidelines' earlier mandate that beds are only excluded based on the area in which they are permanently maintained. In this case, there is no evidence that the beds at issue were ever added to or taken out of service during the cost reporting periods in question or ever permanently maintained in any area other than the acute care areas of the hospitals. Again, if the defendant intended the regulation to simply mean "a bed does not have

to be empty to be available," it could have directly and easily said so, but it did not.

The defendant argues that there is undisputed evidence that on days when the beds at issue were used for observation or SNF patients, they were not "available" for lodging inpatients. However, this ignores the defendant's definition of "available beds" as set forth in the PRM guideline. As defined in the PRM guideline, these beds were "available," even if they housed an observation or SNF patient on particular days.

■ The HCFA Administrator also impermissibly shifted the burden of proof on the issue of counting beds. The PRM guideline expressly states that "[t]he hospital bears the burden of proof to exclude beds from the count." The HCFA Administrator determined that, despite this language, it was not improper to place the burden on the hospitals to include beds in the count, since they bore the burden of proving their entitlement to the DSH adjustment. The defendant argues that this PRM guideline was never written for DSH adjustments, but for the IME adjustment. However, the defendant expressly determined that the same method would apply to both adjustments. Therefore, it is bound by its own interpretation of the IME counting regulation, which interpretation is found in the PRM guideline. Therefore, the burden should have remained on the hospital to exclude beds—necessarily placing the burden on the defendant to include beds—and should not have shifted simply because it would work to the defendant's detriment in this particular case.[7]

Given the above, the Court finds that the HCFA Administrator's decision was

---

7. In making this determination, the Court does not necessarily accept the plaintiffs' argument that they sustained their burden because they never attempted to exclude any

beds. The defendant could have come forward with sufficient proof that certain beds should be excluded, although it did not do so in this particular case.

arbitrary and capricious and not supported by the applicable regulations and PRM guidelines. In so holding, it is not simply that this Court has determined that an alternative construction of the regulations and PRM guideline would be better—that would not be proper. Rather, the Court finds that the HCFA Administrator's construction is unreasonable and is not based upon the language of its own regulations and guidelines. Therefore, it was a clear error of judgment for the HCFA Administrator to ignore the language of the regulations and guideline and instead construe eligibility based solely upon its own statements of intent hidden in the Federal Register. The defendant's application of the regulation with respect to the plaintiffs was arbitrary and capricious and, therefore, must be set aside in accordance with 5 U.S.C. § 706(2)(A).

## VI. CONCLUSION

Regarding the plaintiff's motion for leave to file a supplemental brief, the Court has considered all of the parties' pleadings in reaching its decision, including the defendant's sur-reply filed without leave of Court. Accordingly, the Court, being otherwise fully and sufficiently advised, HEREBY ORDERS that:

(1) plaintiff's motion for leave to file a supplemental brief [DE# 19] is GRANTED;

(2) the Clerk of Court shall file plaintiff's supplemental brief as part of the record as of the date of entry of this Order;

(3) the plaintiff's motion for judgment [DE# 11] is GRANTED and judgment will be entered in the plaintiffs' favor;

(4) the decision of the HCFA Administrator dated November 8, 1999, is REVERSED;

(5) this matter is STRICKEN from the active docket of the Court; and

(6) this is a final and appealable order.

### *JUDGMENT*

In accordance with the memorandum opinion and order entered on even date, the Court, being otherwise fully and sufficiently advised, HEREBY ORDERS that:

(1) the plaintiff's motion for judgment [DE# 11] is GRANTED and judgment be entered in the plaintiffs' favor;

(2) the decision of the HCFA Administrator dated November 8, 1999, is REVERSED;

(3) this matter is STRICKEN from the active docket of the Court; and

(4) this is a final and appealable Judgment.