### ODESSA REGIONAL HOSPITAL

v.

### Michael O. LEAVITT, Secretary of the United States Department of Health and Human Services

#### No. MO–04–CV –116.

United States District Court,
W.D. Texas,
Midland–Odessa Division.

Sept. 12, 2005.

Hope R. Levy–Biehl, Hooper, Lundy & Bookman, Inc., Los Angeles, CA, Byron J. Gross, Hooper, Lundy & Bookman, Inc., San Francisco, CA, Gary R. George, Michael Tighe, Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., Midland, TX, for Odessa Regional Hospital.

James W. Jennings, Jr., U.S. Attorney's Office, San Antonio, TX, for Michael O. Leavitt.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JUNELL, District Judge.

Before the Court are Plaintiff Odessa Regional Hospital's Motion for Summary Judgment, filed March 7, 2005; Defendant Michael O. Leavitt's Motion for Summary Judgment and Response to Plaintiff's Motion, filed April 8, 2005; Plaintiff's Opposition and Reply to Defendant's Motion for Summary Judgment, filed May 6, 2005; and Defendant's Response to Plaintiff's Reply, filed May 31, 2005. On June 15, 2005, the Court held a hearing over the above-listed motions. After careful consideration of the all Motions, arguments at the hearing and relevant law, the Court is of the opinion that Plaintiff's Motion for Summary Judgment should be GRANTED and Defendant's Motion for Summary Judgment should be DENIED because the plain meaning of 42 C.F.R. § 412.105(b) requires that all beds not specifically excluded should be included in the Disproportionate Share Hospital eligibility calculation and the Defendant's own Provider Reimbursement Manual guidelines support the inclusion of observation beds in the eligibility count.

### FACTUAL BACKGROUND

Plaintiff ("Hospital") is a general acute care licensed hospital with 100 beds locat-

ed in Odessa, Ector County, Texas. During Fiscal Years Ending December 31, 1996 and December 31, 1997 ("FYE 12/31/96 and FYE 12/31/97," respectively), the years at issue in this case, the Hospital was certified by the Medicare program to provide inpatient hospital services. Under the Medicare program, the Secretary of Health and Human Services is authorized to disburse extra Medicare funds, known as Disproportionate Share Hospital ("DSH") payments to eligible hospitals that treat a disproportionate share of low-income patients. *See* 42 U.S.C. § 1395ww(d)(5)(F)(v). During 1996 and 1997, a hospital was eligible for DSH payments if it either (a) served a significantly disproportionate share of low income patients; or (b)(1) was located in an urban area, (2) had 100 or more beds, and (3) could demonstrate that during the cost reporting period in which the charges occurred, its net inpatient revenues for indigent care from state and local government sources exceeded 30% of its total net inpatient care revenues during the same period. *Id.* Additionally, at the time in question, the amount of DSH payments a hospital could receive was based upon the number of beds maintained in a hospital. In FYE 12/31/96 and FYE 12/31/97, Plaintiff qualified to receive DSH payments because it served a disproportionate share of low income patients.

Throughout the time in question, 100 licensed beds were available at the Hospital for inpatient care. In 1996, the Hospital averaged approximately 42 inpatients per day and in 1997 approximately 47 inpatients were treated per day. At the same time, the Hospital offered observation services to patients. Observation services are services furnished on site at a hospital, and include the use of a bed and periodic moni-

toring by hospital staff. The purpose of observation services is to evaluate the condition of an outpatient to determine whether the patient should be admitted to the hospital. Any patient undergoing observation services at the Hospital was temporarily treated in an inpatient care bed, as there were no dedicated observation care beds.

On March 11, 1997, the Center for Medicare and Medicaid Services ("CMS") issued a letter which set forth the manner by which observation beds would be counted for the purposes of the DSH adjustment.[1] The letter declared that if observation services were performed by a hospital in beds typically reserved for inpatient care, the days the beds were utilized for observation services would be excluded from the count of available bed days for the purposes of the DSH adjustment.

During FYE 12/31/96, the Hospital's Fiscal Intermediary, Mutual of Omaha ("Intermediary"), determined that the Hospital maintained 1.645 observation beds. This number was obtained by dividing the total days of observation services (602) by the number of days in 1996(366). The Intermediary then reduced the number of beds in the Hospital from 100 to 98.355. This calculation was obtained by subtracting the number of observation beds from the number of beds in the licensed bed count. The Intermediary's act, noted in a Notice of Amount Program Reimbursement ("NPR") dated May 28, 1999, significantly impacted the Hospital by reducing the DSH reimbursement it was entitled to receive and caused it to be ineligible for capital DSH reimbursement.

During FYE 12/31/97, the Intermediary found that the Hospital maintained 1.27 observation beds. As with 1996, this number was calculated by dividing the number

---

1. The letter also set forth the formula for determining the Indirect Cost of Medical Education ("IME") adjustment, which was identi-cal to the formula used for determining the DSH adjustment.

of days of observation services (464) by the number of days in 1997(365). The number of beds in the Hospital was then reduced from 100 to 98.73. The reduction in available beds significantly reduced the Hospital's entitlement to DSH reimbursement and foreclosed its eligibility for capital DSH reimbursement. The Hospital was made aware of the reduction through a NPR dated October 6, 1999, and again an Amended NPR dated August 22, 2001.

After the Intermediary declared the Hospital had less than 100 beds, it concluded the Hospital was only entitled to a 5% disproportionate share adjustment for FYE 12/31/96 and FYE 12/31/97. This was a significantly lower percentage than the 28% and 32% DSH payment adjustment it would have been eligible to receive in 1996 and 1997, respectively.

Upon the reduction of the number of available beds in FYE 12/31/96 and FYE 12/37/97, the Hospital timely appealed the adjustments to the Provider Reimbursement Review Board ("PRRB"). Thereafter, on July 2, 2003, the Hospital and the Intermediary entered into a joint stipulation stating that during FYE 12/31/96 and FYE 12/31/97, the Hospital maintained 100 licensed beds for inpatient care. The stipulation also provided that during the fiscal years at issue, any patients receiving observation care were temporarily treated in beds that were maintained for inpatient care. Further, the parties agreed that during that time period, the Hospital did not have a dedicated observation ward or any beds dedicated to observation treatment. The parties jointly concluded that the only issue before the PRRB was whether "the Intermediary properly excluded days the Provider used inpatient beds for observation purposes from the Hospital's bed count in determining that the Hospital had fewer than 100 beds for DSH purposes." Finally, the parties agreed that the Medicare appeal could be reviewed in a single consolidated board hearing based on the written record.

On April 29, 2004, the PRRB issued Decision No.2004–16. Therein, it found that the Intermediary improperly excluded the observation bed days when determining the count of available beds for DSH purposes. The PRRB further determined that the observation bed days met all of the Medicare program's requirements to be included in the calculation used to determine DSH eligibility and payments. The Intermediary's determination that the Hospital had less than 100 beds for DSH purposes was overturned.

Subsequently, on May 10, 2004, the Intermediary requested that the CMS review the PRRB's decision. On July 6, 2004, the CMS Administrator issued a decision, in which the PRRB's decision was reversed. The CMS Administrator found that the Hospital maintained less than 100 beds for DSH purposes. Thereafter, on September 3, 2004, the Hospital sought review from this Court. The parties maintain that at issue is whether Plaintiff was a 100 bed Hospital for DSH purposes during FYE 12/31/96 and FYE 12/31/97.

## APPLICABLE REGULATIONS AND GUIDELINES

When determining DSH adjustment eligibility, the number of beds in a hospital is examined in accordance with 42 C.F.R. § 412.105(b). *See* 42 C.F.R. § 412.106(a)(1)(I). Section 412.105(b) provides "the number of beds in a hospital is determined by counting the available bed days during the cost reporting period, not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period." Additional guidance for counting beds under § 412.105(b) is found in the Provider Reimbursement Manual

("PRM"), which is published by Defendant. Under PRM § 2405.3.G, a bed is defined as:

> "an adult or pediatric bed (exclusive of beds assigned to newborns which are not in intensive care areas, custodial beds, and beds in excluded units) maintained for lodging inpatients, including beds in intensive care units, coronary care units, neonatal intensive care units, and other special care inpatient hospital units. Beds in the following locations are excluded from the definition: hospital-based skilled nursing facilities or in any inpatient area(s) of the facility not certified as an acute care hospital, labor rooms, PPS excluded units such as psychiatric or rehabilitation units, postanesthesia or postoperative recovery rooms, outpatient areas, emergency rooms, ancillary departments, nurses' and other staff residences, and other such areas as are regularly maintained and utilized for only a portion of the stay of patients or for purposes other than inpatient lodging."

To be considered an available bed, a bed must be permanently maintained for lodging inpatients. It must be available for use and housed in patient rooms or wards (i.e., not in corridors or temporary beds). Thus, beds in a completely or partially closed wing of the facility are considered available only if the hospital put the beds into use when they are needed. The term "available beds" as used for the purpose of counting beds in not intended to capture the day to day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service.

## MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which the moving party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 533 (5th Cir.1996). Further, the moving party has the burden of showing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Willis v. Roche Biomedical Lab., Inc.*, 61 F.3d 313, 315 (5th Cir.1995). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir.1993). "If the moving party fails to meet this burden, the motion must be denied, regardless of the nonmovant's response." *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir.1995).

If the movant carries this burden, the burden shifts to the nonmovant to show the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing the existence of a genuine issue for trial. FED. R. CIV. P. 56(e); *Anderson*, 477 U.S.

at 256, 106 S.Ct. 2505. Unsubstantiated or conclusory assertions that a fact issue exists will not suffice. *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1442 n. 4 (5th Cir.1993); *Thomas v. Price,* 975 F.2d 231, 235 (5th Cir.1992). The nonmovant "must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Krim,* 989 F.2d at 1442 n. 4. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Factual disputes that are unnecessary or irrelevant will not be counted. *Id.* In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden. *Id.* at 254.

All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. If the record, so illuminated, could not lead a rational trier of fact to find for the nonmovant, summary judgment is proper. *Kelley v. Price–Macemon, Inc.,* 992 F.2d 1408, 1413 (5th Cir.1993)(citing *Matsushita,* 475 U.S. at 577–78, 106 S.Ct. 1348). On the other hand, if the factfinder could reasonably find in the nonmovant's favor, summary judgment should be denied. *Id.* (citing *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505). Finally, even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that it would be prudent to proceed to trial. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## STANDARD OF REVIEW OF SECRETARY'S DECISION

■ The standard of review of an agency's construction of a statute involves the examination of two questions. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, the Court must consider "whether Congress has directly spoken to the precise issue." *Id.* If Congress' intent is clear, the Court and the agency must give effect to the "unambiguously expressed intent." *Id.* at 842—43, 104 S.Ct. 2778. However, if the Court finds Congress has not directly addressed the precise issue at question, the Court must determine whether the agency's construction is based upon "a permissible construction of the statute." *Id.* A court may overturn an agency's interpretation of an ambiguous statute only if it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778.

■ After a court finds that an agency's interpretation satisfies the Chevron analysis, it then must determine if the ruling is in accord with the Administrative Procedures Act, 5 U.S.C. § 701 *et seq* (the "APA"). The APA is incorporated by the Social Security Act. 42 U.S.C. § 139500(f)(1). The APA requires reviewing courts to "hold unlawful and set aside" an action by an agency that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (citing 5 U.S.C. § 706(2)(A)). Substantial deference must be afforded to an agency's interpretation of its own regulations. *Id.* (citations omitted.)

## DISCUSSION

A. Plaintiff's Arguments

The Hospital contends that the decision of the Administrator should be overturned

because exclusion of observation beds from a provider's available bed count is inconsistent with the Medicare Act, the Regulations promulgated thereunder and the Defendant's own Manual Provisions. Further, it maintains the APA and Medicare Act Requirements for Notice & Comment Rulemaking were violated when the Defendant issued a substantive policy change, as noted in the March 11, 1997 letter and Modified Cost Reporting Instructions. Plaintiff argues that these substantive policy changes, which were improperly promulgated, cannot be applied retroactively. Finally, it declares that the Defendant's acts in this case are arbitrary and capricious and contravene applicable law.

### B. Defendant's Arguments

Conversely, Defendant argues that the decision to reverse the PRRB was not arbitrary or capricious and was lawful, as it was consistent with the Medicare Act and the Medicare Regulations. Defendant also states that the PRM and longstanding policy supports the Administrator's decision. Finally, Defendant asserts that neither the APA nor the Medicare Act's Requirements for Notice and Comment Rulemaking were violated and that the policy of excluding observation beds from the available bed count is applicable to Plaintiff.

### C. Analysis

Congress has not specifically addressed the issue of whether observation beds should be included in the total bed count when determining a hospital's eligibility for the DSH adjustment. *Clark Reg'l Med. Ctr. v. United States Dept. of Health and Human Services*, 314 F.3d 241, 245 (6th Cir.2002). For purposes of this analysis, the Court finds that the regulations promulgated by Defendant, namely 42 C.F.R. §§ 412.105—.106, constitute a permissible construction of the statute at issue and pass the *Chevron* test. Therefore,

after due consideration, the Court finds that the question at issue in this case is whether the Defendant properly implemented or applied his regulations when he determined the hospital was not entitled to the DSH adjustment. In examining the issue, the Court must determine whether the Secretary's findings were "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with the law." *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), 5 U.S.C. § 706(2)(A).

Under 42 U.S.C. § 1395ww(d)(5)(F)(v), hospitals with 100 or more beds with a 15% low-income patient service rate are eligible for the DSH adjustment. In interpreting the statute, Defendant established regulations that set out the factors to be used in determining if a hospital is eligible for the adjustment. *See* 42 C.F.R. §§ 412.106(a)(1) and 412.105(b). While historically these factors have been used for counting beds for the Indirect Cost of Medical Education ("IME") adjustment, Defendant used the factors contained therein in this case as guidance for counting beds for the purpose the DSH adjustment. *Clark Reg'l Med. Ctr. v. Shalala*, 136 F.Supp.2d 667, 675 (E.D.Ky.2001).

■ The regulation found at 42 C.F.R. § 412.105(b) mandates that the number of beds in a hospital is determined by tallying the number of available bed days in the cost reporting period, excluding beds or bassinets in the healthy newborn nursery, custodial care beds or beds in excluded distinct part hospital units, and dividing that number by the number of days in the reporting period. After studying the regulation, the Court finds that the plain meaning of the section dictates that observation beds should not have been excluded from the bed count, as they are not beds or bassinets in the healthy newborn nursery, custodial care beds or beds in exclud-

ed distinct part hospital units. *Clark Reg'l Med. Ctr.*, 136 F.Supp.2d at 676. Further, the Court finds that if Defendant had meant to exclude observation beds from the calculation, it could have "easily and directly done so." *Id.* A plain reading of the regulation necessitates that all beds are included in the count unless expressly excluded.

Additionally, because Defendant has used the guidelines in 42 C.F.R. §§ 412.105 and 412.106 for the purpose of counting beds for both the DSH and IME adjustments, the Court finds it is "proper to turn to any PRM guidelines interpreting the IME bed-counting regulation for guidance on bed counting for purposes of the DSH adjustment," because a PRM guideline is the "prototypical example of an interpretive rule" that is used to advise the public as to how an agency will interpret statutes and regulations. *Id.* at 675–676, *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) (citations omitted). The language in PRM § 2405.4.G supports the finding that the observation bed days should be used in the eligibility count, as they are not positioned in:

> "hospital-based skilled nursing facilities or in any inpatient area(s) of the facility not certified as an acute care hospital, labor rooms, PPS excluded units such as psychiatric or rehabilitation units, postanesthesia or postoperative recovery rooms, outpatient areas, emergency rooms, ancillary departments, nurses' and other staff residences, and other such areas as are regularly maintained and utilized for only a portion of the stay of patients or for purposes other than inpatient lodging."

The PRM guideline clearly excludes only beds that are found in such defined areas. *Clark Reg'l Med. Ctr.*, 136 F.Supp.2d at 676. None of the observation beds at is-

sue in this case are located in any of these specifically delineated areas.

Additionally, although the PRM guideline at issue states that "a bed must be permanently maintained for lodging inpatients" to be considered available, the Court does not find this requires that a bed cannot be temporarily used for other purposes. *Id.* The guideline states "the term 'available beds' as used for the purpose of counting beds in not intended to capture the day to day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are *added to or taken out of service.*" PRM § 2405.4.G (emphasis added). When the entire PRM is considered, it clearly states that "the number of 'available beds' does not change based on day-to-day fluctuation[s]...and only changes as beds are added to or taken out of service." *Clark Reg'l Med. Ctr.*, 136 F.Supp.2d at 677. Moreover, the guidelines clearly state that the only exclusion for beds is one based on the areas in which they are permanently maintained. *Id.* There is no evidence before the Court to demonstrate that the observation beds in the instant case ever fell into one of the categories requiring exclusion. Consequently, the Court finds the beds used for observation purposes should not have been excluded from the available bed count in FYE 12/31/96 or FYE 12/31/97.

After considering the plain meaning of the applicable regulations and PRM guidelines, the Court finds that the CMS Administrator's to exclude the observation beds from the eligibility count was arbitrary, capricious and unsupported by law. Specifically, the Court finds the applicable statute, regulations and guidelines did not mandate the exclusion of observation beds from the eligibility count. Rather, the CMS Administrator's construction of the

guidelines was unreasonable and not based upon the clear language contained therein. In so finding, the Court holds that the hospital had 100 beds for the purposes of the DSH adjustment for FYE 12/31/96 and FYE 12/31/97. Accordingly, the CMS Administrator's decision must be set aside.

## CONCLUSION

For the above stated reasons, the Court finds that there is no genuine issue of material fact, Plaintiff's Motion for Summary Judgment should be GRANTED and Defendant's Motion for Summary Judgment should be denied. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Odessa Regional Hospital's Motion for Summary Judgment, filed March 7, 2005, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Michael O. Leavitt's Motion for Summary Judgment, filed April 8, 2005, is **DENIED**.